E4seflec

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE
       FLETCHER INTERNATIONAL, LTD.,
4

5                                        14 CV 2836(WHP)

6    ------------------------------x

7                                        April 28, 2014

8                                        3:05 p.m.

9

     Before:
10
                        HON. WILLIAM H. PAULEY III,
11
                                             District Judge
12
                              APPEARANCES
13
     STEWART TURNER, Pro Se
14
     LUSKIN STERN & EISLER, LLP
15       Attorneys for Appellee Richard Davis
     BY:  MICHAEL LUSKIN
16

17

18

19

20

21

22

23

24

25
```

E4seflec

1          (In robing room)

2          THE COURT:  This is a conference that I scheduled in

3    view of an appeal of a bankruptcy order that's been filed and

4    assigned to me, more particularly, following my receipt of a

5    letter from Mr. Luskin dated April 22.

6          Mr. Turner, you're representing yourself in this

7    matter?

8          MR. TURNER:  Yes, I am.

9          THE COURT:  All right.  I'm Judge Pauley.

10         And, Mr. Luskin, you're here on behalf of the trustee?

11         MR. LUSKIN:  I am, your Honor.

12         THE COURT:  All right.  How do you propose that we

13   proceed?  Mr. Luskin, do you —

14         MR. LUSKIN:  I'm Luskin.

15         THE COURT:  I'm sorry.  Mr. Turner, do you want to

16   file a separate brief in connection with this appeal, or do you

17   want me to consider whatever briefs were filed in the

18   bankruptcy court in connection with this matter?

19         MR. TURNER:  I would like to submit a separate brief,

20   your Honor.

21         THE COURT:  When can you submit such a brief?

22         MR. TURNER:  Ideally 30 days.  I have a couple other

23   court cases related to the FILB matter.

24         THE COURT:  You waited to file your notice of appeal

25   in this case, right?

E4seflec

1          MR. TURNER:  I did.  I was learning about the process.

2     I have to -- if I may, your Honor.

3          THE COURT:  Go ahead.

4          MR. TURNER:  I have to file a response to another

5     action brought by Mr. Luskin against me, and other people as

6     well that he referenced in that April 22nd letter.

7          THE COURT:  Mr. Luskin, why don't you tell me what's

8     going on here.

9          MR. LUSKIN:  I'll tell you what's going on in brief.

10         This is a failed hedge of private equity fund,

11    Fletcher International, Limited.  We refer to it as FILB; the B

12    is for Bermuda.  It's a Bermudian fund.  There are two

13    affiliated feeder funds that are Cayman Islands funds that are

14    also in bankruptcy proceedings.  They're in liquidation in the

15    Cayman Islands, and they're under the administration of what I

16    refer to as joint official liquidators, "JOLs."  You'll see

17    that in the papers.

18         The case was filed in late June of 2012, June 29,

19    2012.  Richard Davis was appointed as Chapter 11 trustee in

20    late September, early October 2012, after a litigation-filled

21    summer.  Apparently, at the end of the summer, the judge

22    granted the US trustees' motion to appoint a trustee.

23         The focus of what's been going on is that following

24    his appointment, Mr. Davis retained my firm.  His counsel

25    retained Jay Golden's firm, Golden Associates, to act as

4

E4seflec

1    financial advisor; conducted an intensive investigation of the

2    reasons for the failure of the fund; did all the things a

3    bankruptcy trustee does; issued a report in November of last

4    year, of 2013, about a year after he'd been appointed.

5          The report -- it was a combined report and disclosure

6    statement to bring on confirmation of a plan of liquidation.

7    The funds are long out of business because of the bankruptcy

8    and winding-up proceedings.  The report concludes that the

9    investors were victims of a massive fraud.  Obviously this is

10   contested by Mr. Turner and other insiders.

11         Following the issuance of the trustees' report, there

12   was a hearing on the adequacy of the disclosure statement in

13   bankruptcy, like a proxy statement for a public securities

14   registration.  That was approved, and solicitation package went

15   out to investors.  Votes were solicited.  The plan was

16   approved.

17         Now, I've shortcut some of the proceedings.

18   Mr. Turner, others, were active litigants in these proceedings.

19   There were objections filed.  Changes were made to the plan, to

20   the disclosure statement and so on.  But none of that's

21   germane, or the substance of that certainly isn't germane here.

22   I think the fact that Mr. Turner has been an active participant

23   filing papers throughout is relevant.

24         Following the solicitation, the votes were taken.  The

25   plan was approved following a hearing before the bankruptcy

E4seflec

1    court in late March, the end of March.  Again, to answer your

2    Honor's question about what's going on, the plan is a

3    liquidation plan, and it basically creates two buckets of

4    assets.  One bucket are the assets that were owned solely by

5    the debtor, by FILB, which consisted mostly of securities,

6    including the securities that are the subject of this appeal,

7    the UCBI warrants, some other assets, some other investments.

8    Those are being liquidated and divided up in accordance with --

9    let's call it one waterfall of distributions.  That's the

10   liquidation bucket.

11         There's a second bucket that we refer to as the pooled

12   claims.  What we've done is that the FILB trustee, together

13   with the JOLs in the Caymans and one of the investors, the

14   Massachusetts Bay Transit Authority -- it's a public pension

15   fund -- have collectively pooled their claims and causes of

16   actions against insiders, including Mr. Turner, and also

17   third-party service providers, accounting firms, law firms, so

18   on.  And the recoveries on the pooled claims will be divided

19   according to a different waterfall, different percentages.

20         The FILB estate, the bankruptcy estate, is a

21   participant in the pooled claim bucket, so that if a dollar is

22   recovered on pooled claims, FILB gets 26, 27 cents, and then

23   that goes into the liquidation claim, and that gets distributed

24   as to liquidation claims are distributed.  So that's a process

25   that has all been undertaken and completed in the bankruptcy

E4seflec

1    court.  The plan is confirmed.  We're post confirmation.  We're

2    out of bankruptcy.  We're operating under the plan.  And that's

3    moving ahead, we're collecting -- we're realizing on assets,

4    and we're on the FILB assets.  And we're also prosecuting the

5    pooled claims.

6            Now, that's the big picture background of where we

7    are.  Why we're here today is because during the course of the

8    Chapter 11 proceedings, the trustee, my client, liquidated some

9    of the assets.  We didn't wait for the confirmation of the

10   plan.  We liquidated certain assets as the case went along, and

11   we did that under either Section 363 of the bankruptcy code,

12   which provides for the sale of assets out of the ordinary

13   course, or in many cases, these securities were subject to

14   litigation claims.  We litigated or negotiated settlements and

15   arrived at settlements under bankruptcy Rule 9019.  The UCBI

16   warrants, which are the subject of this appeal, were the

17   subject of a 9019 settlement.

18           And to jump to the end first, there was a hearing on

19   that settlement in March, a couple of weeks before the

20   confirmation; I think it was March 19.  Mr. Turner filed an

21   objection.  I think there was one other objection.  The judge

22   took testimony.  As is his practice, direct is on written

23   testimony.  He took direct written testimony, admitted

24   documents in evidence, made findings of fact, conclusions of

25   law that are reflected in the transcript that's attached to the

E4seflec

1    designation of record and statement of issues on appeal that

2    Mr. Turner filed.

3          The governing law under 9019 is that a settlement must

4    be an exercise of sound business judgment that falls above the

5    lowest point in the range of reasonableness.  That's in a

6    series of US Supreme Court and Second Circuit cases.  I think I

7    cited them in my letter.  The judge found in his discretion

8    that the trustee had exercised his appropriate discretion to

9    enter into the settlement.

10         So what's the settlement about?  The settlement

11   involves what to do with these warrants.  And without going

12   into all of the excruciating detail on them, the warrants are

13   basically for -- UCBI is a regional bank in Georgia, a common

14   stock.  And they have a strike price of $4.25.  And it's

15   actually a -- the warrants are what are called cashless

16   warrants.  So you don't actually have to come up with cash.

17   There's a formula that gets applied that takes -- it

18   essentially grosses it up, takes out the 4-and-a-quarter and

19   gives you the balance of the shares that you would get.  So

20   they're referred to as cashless warrants.  And these were

21   warrants that were in the FILB estate from a transaction that

22   dated first half of 2010.

23         In the first half of 2011, again, before the

24   bankruptcy, before the trustee, UCBI engaged in what is

25   called -- I think, again, I refer to it in the letter -- as a

E4seflec

one-to-five reverse split.  It reduced the number of shares by

a factor of five, by five-fold.  And the dispute over those

warrants emerged at that time.

        Why did it emerge?  Because FILB took the position

before bankruptcy, during bankruptcy and after the appointment

of the trustee, the trustee took the position that under the

terms of the warrants themselves, the strike price remained

unaffected by the reverse split.  The strike price remained

$4.25 instead of going up by a factor of five to be $21.25.

        Why does it make a difference?  Well, it makes a

difference if the stock -- well, it made these warrants from

being in the money, arguably, to out of the money.  At least

today the stock is at 17-something.  It's sort of a black and

white issue here.  If we're right, the warrants are very

valuable.  And if we're wrong, they have very little value; a

few million dollars maybe.  But there's some intrinsic value

that the quants come up with and run through models and will

give you an answer.

        But as I said, UCBI rejected FILB's effort to exercise

the warrants.  They rejected two efforts by us, by the trustee,

to exercise the warrants.  We entered into negotiations with

them.  We took the position again that the reverse split under

the express terms of the agreement, we said, had no impact on

the strike price.  We point to a New York Court of Appeals case

which basically says that sophisticated people are held to the

E4seflec

1    terms of agreements they write and they mean what they say.  We

2    don't read things into them.

3          UCBI took the position that, while that's all well and

4    good with respect to one provision of the agreement, if you

5    look at a different provision of the agreement, the strike

6    price does go up, because it's set by reference to a formula

7    and a definition that clearly makes reference to reverse

8    splits.

9          So we rely on one section.  They rely on another

10   section.  We run the risk -- our analysis is that if we're

11   right, well and good; if we're wrong, it's highly likely that a

12   court hearing this is going to say, well, there's some

13   ambiguity here.  The two sections can't be meshed.  I'm going

14   to allow parol evidence in to determine what the parties

15   intended, and I'm going to be able to apply equitable

16   considerations to determine whether or not the parties really

17   intended this kind of windfall in the event of a reverse split,

18   because that's how UCBI looks at it; that we were entitled to

19   do a reverse split.  You're entitled to maintain your option

20   but you have to adjust it up.

21          The agreement does provide, by the way, that for a

22   forward split, the more normal kind where, you know, one share

23   becomes three shares or five shares, that the strike price

24   would be adjusted.  So fair ground for litigation is our view,

25   is the trustees' view.  We negotiate.  We don't get anywhere or

E4seflec

1    we don't get very far.  The trustee decides to test the market,

2    to see what the market will pay for these warrants in light of

3    the disclosed litigation risks.  We retain a broker.  The

4    broker exposes it to 109 different people.  We get seven bids

5    from six different bidders.  The bidders are either for all

6    cash, pretty easy to understand, or for a combination of cash

7    in a lesser amount and a piece of the litigation.  They would

8    be litigating with UCBI.  And, if successful, or if there were

9    a settlement, we would get a piece of that.

10         The trustee negotiated with the six different bidders

11   on the seven different bids.  There was an auction process that

12   allowed for negotiation between bids.  When he identified the

13   highest of the bidders other than UCBI, other than the company,

14   he went to UCBI and said, you're going to lose.  This is going

15   to go to such-and-such investor -- no names were used; this is

16   all confidential -- but a well known hedge fund investor that

17   invests typically in distressed securities with litigation risk

18   attached to them.  And UCBI topped all the bids with its

19   $12 million cash bid.  That was certainly much higher than the

20   next highest cash bid, which was 8 million, but not a firm bid,

21   and it was about twice the cash for the next highest bid, which

22   was the hybrid bid that included six-and-a-quarter million

23   dollars and about 25 percent of any recovery.

24         Now, it's logical that UCBI would spend more because

25   they're getting peace -- there's not going to be any more

E4seflec

1    litigation -- whereas, if we sell it to one the higher bidders,

2    they're just going to be in litigation with one of the hedge

3    funds.  So at the end of the day, the trustee says, UCBI will

4    be the winning bid.

5          This is taken to the bankruptcy court under 9019,

6    under Rule 9019, with notice to everybody.  Mr. Turner was the

7    only one objecting to that settlement.  Again, the judge

8    conducted a hearing, took evidence, direct evidence from

9    Mr. Davis, from the trustee, in the form of his declaration.

10   Admitted in evidence a whole binder full of exhibits.  He --

11         THE COURT:  Was there any cross-examination?

12         MR. LUSKIN:  There was not.  There was the opportunity

13   for cross-examination.  As the rules provide, as the judge's

14   rules provide, Mr. Davis was there in court, available to be

15   cross-examined.  Those were the ground rules, and as is

16   typically the case in bankruptcy court, at least before Judge

17   Gerber, where you put in direct and then go right to cross.

18         I did not cross-examine Mr. Turner.  Most of his

19   evidence consisted of opinion testimony on the value of these

20   warrants and on the handicapping of the litigation.  And the

21   judge excluded that evidence, both for failure to comply with

22   Rule 26 and Rule 702, putting in a written report in accordance

23   with the rules, and also made the finding that he rejected any

24   thought of relying on predicting where securities markets were

25   going to go.

E4seflec

1          And I think, as your Honor can read in the transcript,

2     Judge Gerber said that there is no obligation for a bankruptcy

3     trustee to gamble on the market.  He does not have to hold

4     securities.  He's entitled to sell them, as long as he's

5     exposed them to the market in a reasonable manner, which he

6     found that Davis had done.

7          So the settlement was approved.  And under the terms

8     of the settlement agreement, we don't close the settlement

9     until there are -- if there's an appeal pending, all of our

10    counterparties negotiated that.  And there was negotiation over

11    that, is all I can really say.  So as a result of Mr. Turner's

12    filing of his notice of appeal, we haven't closed.  The money

13    is not sitting in our account.  We do not get the benefit of

14    interest or other earnings during that time.  UCBI does, if

15    they funded it.  And we can't make use of it.  We had the right

16    to use 8 million of the 12 million; 4 million is put aside as a

17    reserve for other potential claims.

18         Our view, I think, as I stated at the outset, is that

19    this is an appeal that is without merit; that it's a review

20    standard on findings of fact where the judge is clearly

21    erroneous.  I think the judge was very careful in nine or ten

22    pages of the transcript to describe the bases for each of his

23    findings, and they are in the record undisputed.  I don't think

24    there's a basis to find that Judge Gerber either abused his

25    discretion or was clearly erroneous.  And of course what he was

E4seflec

1    reviewing was the discretion of a Chapter 11 trustee, which is

2    also fairly broadly defined under the TNT Trailer ferry case

3    and the other Grant case.  And he did what you'd expect a

4    trustee to do:  Expose this asset to the market to determine

5    which of his options he would exercise.  So, one, to litigate

6    on his own with UCBI, the other to sell for cash, and the other

7    to sell for cash and a piece of someone else's litigation.

8           So here we are.  The rules -- and I think your Honor

9    is -- the docket entry indicates that Mr. Turner's appellate

10   brief would be due May 6th.  We think that under the

11   circumstances the process should be expedited.  That's why we

12   suggested just going ahead on what was filed below.  I can't

13   think of a new argument that hasn't been made and isn't

14   reflected in the transcript.

15          Obviously Mr. Turner is entitled to his day in court,

16   but if this is going to take a while, there should be a bond.

17   Frankly, no one expected an appeal of this nature,

18   discretionary decision based on the trustees' discretion with a

19   record devoid of opposition; admissible opposition, let me put

20   this that way.

21          And while I think both the bankruptcy court and this

22   court, I'm sure, do everything to ensure that Mr. Turner is

23   entitled to his day in court and accorded due process, we are

24   the ones that are being injured by this.  The settlement is

25   held up.  It hasn't closed.  Our view is there is no

E4seflec

1    likelihood, no possibility of success on the merits of the

2    appeal.  The public interest is in favor of trustees entering

3    into negotiated settlements like this.  We're the ones being

4    prejudiced, and he's not.  So we think at minimum there should

5    be a bond to compensate us for the loss of the use of the

6    money, the interest on the money.

7              THE COURT:  What do you estimate that to be?

8              MR. LUSKIN:  Well, interest on $12 million, you know,

9    I figure that's -- I think 5 percent.  I think $600,000 bond is

10   appropriate bond.  I think it's actually a low bond on

11   something like this, given appeals.  I understand we're dealing

12   with a pro se, which he's probably going to choke on the

13   amount.  We object to it.  It's deeply subordinated.  That's a

14   separate proceeding.  He's a defendant in a major fraud case.

15             MR. TURNER:  Alleged.

16             MR. LUSKIN:  And certainly one of the targets of a

17   lengthy trustees' report that lays out all sorts of wrongdoing.

18   Those are other proceedings.

19             THE COURT:  Let me hear from Mr. Turner.

20             MR. TURNER:  Thank you, your Honor.

21             While Mr. Luskin lays this out ever so simply and

22   easily that I might wonder if I need to call my wife and tell

23   her I won't be coming home tonight, I think it is nowhere near

24   as simple as Mr. Luskin points it out.

25             I've taken notes here.  I want to respond to all of

E4seflec

1  his comments, but, first, I'm not even sure what that letter

2  was.  I'm a pro se attorney, and I'm not sure what that letter

3  is that Mr. Luskin sent.  Whether it's a brief, a filing, do I

4  need to respond to it here in time?

5          THE COURT:  No.  It's a letter application essentially

6  to have the Court hear the appeal on the briefs below.  But

7  you've already stated to me that you have an objection to

8  proceeding in that fashion, and I'm going to give you an

9  opportunity to present me with a brief in connection with your

10  appeal.

11          But I think my first question would be what new

12  arguments do you intend to raise in a brief that you have not

13  raised and fully discussed in the briefs presented below to the

14  bankruptcy judge?

15          MR. TURNER:  First, I don't believe that there was an

16  opportunity for me to cross-examine Mr. Davis in the March 19th

17  trial.  If there was, I clearly missed it.

18          But more importantly, I've only received one binder of

19  exhibits from Mr. Davis or Mr. Luskin.  And that was in regard

20  to what I need to file an appeal by, by May 9th, which is his

21  fraud case, which I say is alleged and incorrect.

22          THE COURT:  That case is not before me.

23          MR. TURNER:  But I have not seen the exhibits.

24          THE COURT:  All right.  If I could just interrupt for

25  one second.

E4seflec

1          You started a moment ago by telling me that you're a

2   pro se attorney.  My question is:  Are you an attorney?

3          MR. TURNER:  Sorry.  I am pro se.  I am not an

4   attorney.  I did not go to law school.

5          THE COURT:  Fine.  Thank you.  Go ahead.

6          MR. TURNER:  Although I feel like I'm being schooled

7   lately.

8          THE COURT:  This is an expensive way to get a legal

9   education.

10          MR. TURNER:  Yes.  But --

11          THE COURT:  Even as expensive as law school is, this

12   is a more expensive way to get a legal education.

13          MR. TURNER:  This is not my goal.

14          THE COURT:  All right.  Go ahead.

15          MR. TURNER:  I do not see any exhibits in regard to

16   the UCBI warrant.  I'm not on PACER and may have missed it, but

17   other times I've received -- I've received one binder.

18          THE COURT:  Have you registered on ECF with this

19   Court?

20          MR. TURNER:  No, I have not.  Do I need to do so?

21          THE COURT:  I want you to do so today after we

22   conclude today.  You can stop down in the clerk's office,

23   because that's the best way for us to communicate with you and,

24   ultimately, for you to communicate with us, although you must

25   submit a courtesy copy, a paper copy, of anything that you

E4seflec

1    might file on ECF.  You must submit it to us so that we're

2    aware of it.

3              MR. TURNER:  Okay.  I will do so, your Honor.

4              THE COURT:  Getting back to my question, which was

5    what new arguments would you be reading on the appeal?

6              MR. TURNER:  I would like for some judge to go through

7    the agreement itself.  I would be going through the agreement.

8    I would be going through the Reiss case.  I would be going

9    through the understanding of why Fletcher insisted upon certain

10   terms in the agreement.  These agreements in the United case,

11   there was -- there were three agreements.  There was an 83-page

12   securities purchase agreement, a 16-page warrant that went with

13   it and, separately, a 175-page agreement related to an asset

14   purchase, which has been taken by Mr. Davis and by Mr. Luskin

15   to mean something other than it was meant to mean.  It was just

16   a way of getting the warrants.

17             It was a very highly customized document.  And every

18   sentence in that document, based on Fletcher's 18 years of

19   experience, or 17-and-a-half prior to that, led to each

20   sentence being specifically put in there or not in there, and

21   there's a rationale behind that.  Unfortunately, the court did

22   not hear that -- I don't believe there was the opportunity for

23   cross-examination.  And the agreement itself was never

24   specifically reviewed.  I would like a judge --

25             THE COURT:  How do you know that?  What's the basis

E4seflec

1   for your assertion that the agreement was never specifically

2   reviewed by the bankruptcy judge?

3   　　　　MR. TURNER:  I don't believe the judge made a

4   reference to his review of the document in his filing.

5   Mr. Luskin in the March 19th hearing did state that there were

6   some questions, but there was never to my knowledge any

7   physical evidence put forth.  It was just done.  And if you

8   could give me a little leeway, there was a following hearing

9   before Judge Gerber the following week, where I'm trying to

10  move from insider status in claim five up to -- class five to a

11  class three claimant.  And that -- that is the binder of

12  exhibits -- I misspoke before.  That's the binder of exhibits

13  presented to me by either Mr. Davis, or I think the Luskin firm

14  sent me the binder of exhibits.  But I never received similar

15  documents, particularly including the agreement.

16  　　　　And the most important thing about this, the United

17  assets, Mr. Luskin went on how there were a few assets they

18  sold and there were some others they may sell.  One he

19  referenced in court could be worth 40,000 or $140,000.  This

20  asset, the UCBI, the remaining asset, is worth the majority of

21  FILB, and I believe the difference between solvency and

22  insolvency.  If it sold for $12 million, with all the fees

23  charged by people -- Mr. Luskin referenced his firm, the Golden

24  firm, Mr. Davis and actually the broker who will be receiving

25  $500,000, is my understanding, when I think anybody in the

E4seflec

business would know that United itself would outbid anybody;
especially as Mr. Luskin made the auction sound, they got the
opportunity to bid less, or not necessarily less, but
continuous bidding.

I spoke to a friend who has a hedge fund.  He said, I
might bid 13 million for it, but why should I bother if the
company could then go ahead and bid 14?  What's the point of
bothering?  On the merits I think the contract is very simple,
given that it's a total of 270-some pages.  The item referenced
with the stock split, it is clear and was probably the most
clear of any of our documents, over time we've -- we worked to
improve the documents, certainly in favor of Fletcher
International, Limited, over time.  And the document clearly
states that a stock split leads to additional shares at a lower
strike price, not fewer shares.  It doesn't say not fewer.

It is particularly silent on the issue of a reverse
stock split, and that was done with legal advice.  It was done
to -- I hate the sound of Mr. Luskin's word windfall, but it's
a benefit to Fletcher International because oftentimes, when a
company does a reverse stock split, the stock often goes back
down to the price, even if it was one for two, in which case,
effectively, the company loses half of its market cap.  And one
for five, it would lose 80 percent of its market cap.  This
time, thank God, it didn't go down.  And I think that is
something that the shareholders of Fletcher International,

E4seflec

 1     through various feeder funds, should benefit from.

 2              The case law -- Mr. Luskin referenced it but didn't

 3     cite its name -- it's the Reiss case, Reiss vs. Financial

 4     Performance.  I am told it's the only case on point.  I'm not a

 5     lawyer, and I can't check this stuff out, but I've been told

 6     that it's the only case on point.  And it favors the Fletcher

 7     point of view.

 8              And while Mr. Luskin and Mr. Davis have questioned

 9     some of our valuations, very simplistically to me the idea of

10     reasonableness comes in in this sense:  This warrant still has

11     several years to go, and it's -- but it's deeply in the money.

12     There's a couple million dollars of time value.  Let's not

13     discuss time value here.  It's simply a warrant for --

14     $30 million divided by 4-and-a-quarter is a shade over

15     7 million shares.  Mr. Luskin said the stock price is over 17.

16     That's where I noticed this morning, let's say it's

17     17-and-a-quarter, 17-and-a-quarter minus 4-and-a-quarter strike

18     price.  It's $13 times a little over 7 million shares.  It's

19     worth 91, 92 million dollars.

20              At the time I appeared before Judge Gerber, that

21     morning the stock was at 19.40.  And I have a reason for that,

22     but that is a tangent that I shouldn't discuss now, but I will,

23     if you serve a request.  But it's either -- at the time it was

24     $106 million in the money and 12 versus 106, when case law

25     supports that 106 does not seem to be the lowest level of

E4seflec

1    reasonableness, especially if you then start subtracting out

2    fees due to various firms for the ultimate -- for the creditors

3    and for the shareholders, it's not even 12 versus 106.  It

4    could be maybe 8 versus 102, or something like that.  And with

5    case law, honestly, I think it should -- lowest level of

6    reasonableness should be half, maybe a little less than half.

7    But 12 versus 106 or 8 versus 102, without a thorough review of

8    the documents by anyone, by any judge, just doesn't seem within

9    the realm of TMT Trailer, especially where it calls for

10   judicial review, and especially on big numbers.  And this is

11   the difference between solvency and insolvency.

12            If I may go through Mr. Luskin's points.

13            THE COURT:  Well, I mean, you can save much of that

14   for the brief that you're going to submit in connection with

15   the appeal.  I mean, at the end of the day, what about the

16   bankruptcy judge's determination and the trustees'

17   determination that the avoidance of the uncertainty of

18   continued litigation in the case was a premium deserving of

19   recognition?

20            MR. TURNER:  I think it's certainly worthy of

21   discussion.  I'm just not sure that the actual facts have been

22   reviewed, and that they should be reviewed by a judge.

23            Mr. Luskin spoke in court.  I responded for a small

24   fraction of the time Mr. Luskin spoke.  And the judge made his

25   decision.  There was no opportunity for me to cross Mr. Davis.

E4seflec

1   There was -- I don't believe it was offered at all.  And I'm

2   not sure that -- based -- Mr. Luskin gives a compelling

3   argument every time he speaks.  I mean, he's been an attorney

4   for many years.  He's better at this than I am.  But I think

5   the facts should actually -- and the actual underlying

6   documents should be reviewed explicitly by a court.

7           THE COURT:  What about Mr. Luskin's argument that your

8   claim on this appeal is 30-some-odd-thousand dollars, and that

9   it's delaying a settlement of 12 million?

10          MR. TURNER:  Well, my claim may only be $30,000.  It's

11   significant to me.  But it's also -- I think other shareholders

12   can benefit from a fuller hearing of the facts, or the first

13   hearing of the facts.

14          Mr. Luskin also talked about the trustees' report and

15   the disclosure statement.  And while it sounds like all I do is

16   object, I only filed a handful of objections.  But Judge Gerber

17   insisted that when the trustee reporting the disclosure

18   statement was sent to the actual creditors -- by the way, I

19   think the vote was three-nothing in favor of the plan versus

20   maybe 80 creditors.  Judge Gerber insisted that Mr. Luskin

21   write in bold print on the second or third page that so far

22   this is only the trustees' opinions.  They have not been found

23   true yet, if they ever will be, and they've never really been

24   hashed out in court; certainly no back and forth, no

25   cross-examination.

E4seflec

1          And this United warrant, in addition to getting

2   potentially $100 million, 90 based on where the stock is now,

3   for the creditors, for the claimants, can also impact the

4   distribution of such claims.  The joint official liquidators

5   that Mr. Luskin referred to in the Cayman Islands, they were

6   given other assets in United, which our outside valuation

7   analyst valued at $136 million.  They sold it for

8   two-and-a-half million.  It's a terrible, terrible, terrible

9   sin.  And leads people mistakenly to think that we're bad guys,

10  and that's why we're being sued.

11          But if I were to borrow a gazillion dollars from

12  you -- it's not a bribe or anything, but pay you off with a

13  Picasso that you sell for $10, doesn't mean that I didn't pay

14  off my debt.  It just means the sale of the Picasso for $10 was

15  wrong.  And Massachusetts MBTA -- which is actually one of the

16  litigants that I have to worry about in this other case, and

17  we'll be meeting with a lawyer for them -- they -- I think if

18  the Court hears the case and realized that the value of this is

19  worth 100 million, and then I realize we have to go to another

20  court to actually have FILB vs. United, that will explain that

21  the value given to the proceeding investors was also worth what

22  we said it was worth and, therefore, on the Massachusetts

23  pension fund, which now would be settling for maybe $2 million,

24  could get as much as $50 million, if this is all heard

25  properly.  And that's why I want to talk to them.

E4seflec

| | |
|---|---|
| 1 | THE COURT:  All right.  I want to do two things:  I'm |
| 2 | going to fix a schedule for the submission of briefs in the |
| 3 | case.  I want to get before me the record that the two of you |
| 4 | agree should be considered in connection with this appeal, the |
| 5 | exhibits -- |
| 6 | MR. LUSKIN:  I believe that's been agreed already, |
| 7 | your Honor. |
| 8 | THE COURT:  All right.  But someone can -- |
| 9 | MR. LUSKIN:  We will get them to you. |
| 10 | THE COURT:  -- put that bundle of materials together |
| 11 | for us.  And I think that, given the nature of this dispute, |
| 12 | that some bond is appropriate here; not the bond that |
| 13 | Mr. Luskin is suggesting, but is there any reason that you |
| 14 | can't post a $20,000 bond in connection with this appeal? |
| 15 | MR. TURNER:  I don't have it.  I would like that not |
| 16 | to become part of the public record.  Because of other issues, |
| 17 | I have not been able to draw a salary from Fletcher |
| 18 | International Partners, which is not the subject here, but it's |
| 19 | making my life difficult and also is inhibiting me here from |
| 20 | posting a bond. |
| 21 | THE COURT:  What's going on?  Is there discovery going |
| 22 | on in the other case? |
| 23 | MR. LUSKIN:  The other cases were filed two days after |
| 24 | the confirmation.  So they were -- they have just begun. |
| 25 | Discovery has already been made extensively in the bankruptcy. |

E4seflec

1          THE COURT:  I'm not going to give you 30 days, then,

2    to file your appeal.

3          MR. TURNER:  Okay.

4          THE COURT:  I'm going to tee this up promptly and

5    resolve it.

6          Are you capable of posting a $5,000 bond?

7          MR. TURNER:  Not today.

8          THE COURT:  When you say "not today" --

9          MR. TURNER:  I'm hoping to get a few bucks that I can

10   pay my rent with.  Not today, not -- not until the other issue

11   is resolved.  I'm not sure how much interest -- interest rates

12   are near zero percent these days.

13         THE COURT:  I understand that.  But do you want to be

14   heard further?

15         MR. LUSKIN:  Just very -- not really, your Honor.

16         THE COURT:  Good.  Okay.

17         MR. LUSKIN:  I don't need to be heard.  You've said

18   it, your Honor.

19         MR. TURNER:  I'll work on an expedited schedule.

20         MR. LUSKIN:  I was just going to point out there is

21   this May 6th date that exists, and we're prepared to file a

22   brief a week later.  But I would prefer if there's going to be

23   no bond -- which I object to, but obviously that's your

24   decision -- I don't see any reason why it couldn't be sooner

25   than this, your Honor.  You asked Mr. Turner what's new, what

E4seflec

1    are the new arguments.  Every single thing he said, he said

2    below.  It's in the transcript.

3              I would submit today.

4              MR. TURNER:  I disagree with Mr. Luskin.

5              THE COURT:  Can you file your brief on this appeal by

6    May 6th?

7              MR. TURNER:  I will make sure that I get it done.

8              THE COURT:  All right.  You'll file your opposition

9    brief by when, by May 13?

10             MR. LUSKIN:  Yes.

11             THE COURT:  And I'll give you the opportunity to file

12   a reply brief by May 20.  And I will put this down for oral

13   argument on May 22 at 3:30.  I would like the record to be

14   submitted to me by next Tuesday, by May 6th.

15             MR. LUSKIN:  You'll have it, your Honor.

16             THE COURT:  And I'll look to you, Mr. Luskin, to

17   coordinate with Mr. Turner so --

18             MR. LUSKIN:  We're going to take his entire

19   designation, and we didn't add or object to anything in that.

20             THE COURT:  So I'm going to enter that scheduling

21   order with respect to the case.  I must tell you that under

22   virtually any other circumstance, I would be imposing a bond in

23   this case.

24             MR. TURNER:  Thank you, your Honor.

25             THE COURT:  But --

E4seflec

1          MR. LUSKIN:  I guess there's nothing I can be heard on

2     on that, your Honor.  It is just unfair to the trustee to put

3     off this closing.  Now it's going to be at least another month.

4          MR. TURNER:  In all fairness, Mr. Luskin's agreement

5     called for an appeal, which didn't call for a bond.

6          THE COURT:  Look, if I can decide this from the bench,

7     I will.  But the case is not going to linger.  As soon as I get

8     a letter, I am on it.

9          MR. LUSKIN:  Absolutely, your Honor.

10         THE COURT:  All right?

11         MR. LUSKIN:  Yes.

12         THE COURT:  Thank you.

13         MR. LUSKIN:  Thank you, your Honor.

14         MR. TURNER:  Thank you, your Honor.

15         THE COURT:  Don't forget --

16         MR. TURNER:  Where?

17         THE COURT:  Go to the first floor.

18         Where's the pro se office?

19         THE DEPUTY CLERK:  Second floor.

20         THE COURT:  Go to the second floor.  Check with pro se

21    first, and then -- make sure you get an ECF log-on so that

22    you'll get -- because I'm going to enter a scheduling order

23    today setting forth these dates, all right?

24         MR. TURNER:  Okay.

25         THE COURT:  Thank you.  (Adjourned)